(C.D. 2588)

VICTOR B. HANDAL & BRO., INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided November 17, 1965)

Siegel, Mandell & Davidson (Allan H. Kamnitz and David Serko of counsel) for the plaintiff.

John W. Douglas, Assistant Attorney General (Richard J. Kaplan and Alfred A. Taylor, Jr., trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: This case is concerned with the proper rate of duty to be levied upon certain imported corduroy articles, invoiced, variously, as corduroy pillow covers or corduroy pillowcases. These items were assessed with duty at the rate of 50 per centum ad valorem as corduroy articles finished or unfinished, within the purview of paragraph 909 of the Tariff Act of 1930. It is claimed in the protest filed against the collector's assessment of duty that said merchandise is properly dutiable at the rate of 20 per centum ad valorem, pursuant to the provisions of paragraph 923 of said act, as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by Presidential notification, 90 Treas. Dec. 280, T.D. 53877, for manufactures of cotton, not specially provided for; or at the rate of 12½ per centum ad valorem as cotton pillowcases, as provided in paragraph 911(b) of said act, as modified and supplemented, supra.

The respective paragraphs, insofar as here pertinent, read as follows:

PAR. 909. Pile fabrics (including pile ribbons), cut or uncut, whether or not the pile covers the entire surface, wholly or in chief value of cotton, and all articles, finished or unfinished, made or cut from such pile fabrics, all the foregoing, * * * if corduroys, plushes, or chenilles, 50 per centum ad valorem; * * *.

Paragraph 911(b), as modified, supra:

Sheets and pillowcases, wholly or in chief value of cotton_____ 12½% ad val.

Paragraph 923, as modified, supra:

All manufactures, wholly or in chief value of cotton, not specially provided for:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|
| Other (except * * *). | | | | | | 20% ad val. |

Although the contention that paragraph 923 has application to the instant merchandise was not expressly withdrawn, it has not been

pressed, and, especially, since it is obvious that either of the other paragraphs here in controversy would more specifically describe the cotton corduroy articles here involved than a blanket provision for manufactures of cotton, we consider it to have been abandoned. Accordingly, claim for classification in paragraph 923, as modified, *supra*, is dismissed.

The merchandise in issue is represented in the record by plaintiff's exhibits 1 and 2, the latter being encased in a plastic bag, illustrative of its condition as imported. The article is composed of two oblongs of 16 wale cotton corduroy, approximately 24 by 17 inches each, stitched together across both lengths and one width in the form of a bag. The remaining width is zippered. Printed on the plastic wrapper are the following statements:

SLEEPY TIME
ZIPPERED PILLOW COVER
OF
WASHABLE CORDUROY
ANY BED PILLOW
QUICKLY BECOMES
A LOUNGING PILLOW
Enjoy full size bed pillow
comfort—Practical
—Decorative
—Economical
This pillow cover is made in Japan and superbly tailored for long wear
100% cotton

Apparently illustrative of the use of the subject merchandise in the manner described by the foregoing statements, there are sketched representations of a child resting on a pillow on the floor of a room while listening to a phonograph, a man using a pillow behind his back while driving an automobile, a woman in a lounge chair, with a pillow at her back, reading a book.

The record further consists of the testimony of five witnesses appearing on behalf of plaintiff and two on behalf of defendant, together with six other exhibits to which reference will be made, *infra*.

Plaintiff's first witness was Mr. Victor B. Handal, founder of the company and its vice president. He testified that his company has been in the business of importing a general line of merchandise from all over the world, for a period of about 29 years and, in addition, since 1939, has been manufacturing handkerchiefs, pillowcases, and sheets. For the past 4 or 5 years, the company has been importing merchandise like exhibit 1, which was designed so as to fit all pillows generally used as bed pillows.

The purpose of the article, according to this witness, is, in effect, to convert a bed pillow into a lounge pillow so that it can be taken

out of the bedroom and used elsewhere in the house, especially in connection with television viewing and napping. And this is the way he personally has used this article, as indicated by plaintiff's exhibit 4, an ordinary bed pillow with a corduroy zippered cover, identical to plaintiff's exhibits 1 and 2, and the way in which he had seen it used in his travels throughout the country, more particularly in hotels in the cities of Washington, D.C., Dallas, Houston, St. Louis, Kansas City, Chicago, Boston, New York, Jacksonville, Miami, Mobile, and New Orleans.

Articles like plaintiff's exhibit 1 are used either over a traditional white pillowcase, or in lieu thereof, and are not generally used to cover a pillow for sleeping at night. In these respects, as well as in texture and in the fact that it has a zippered closing, rather than an open flap, it differs from plaintiff's illustrative exhibit 3, which is a hand screen printed sleep pillowcase.

Mr. Handal was of opinion that, insofar as the 1930 edition of the New Standard Dictionary and the 1933 edition of Webster's New International Dictionary defined a pillowcase as composed generally of white linen or cotton cloth, they did not reflect modern style trends which tend to be more decorative and would include pillowcases of different colors, made of nylon, silk, and other materials. Insofar as those definitions, which were read to the witness, described an article used to cover a bed pillow, which is both removable and washable, they would, in his view, correspond with the present meaning of the word.

Pillow covers of the type here involved first appeared on the domestic market some 6 or 7 years prior to the trial of this case. They were designed solely for use with bed pillows, but would not ordinarily be used for sleeping at night.

On cross-examination, Mr. Handal testified that these covers are imported in six solid colors, and also in a university-pennant print, as illustrated by plaintiff's exhibit 5. There were no matching sheets. He considers these articles to be pillowcases because they cover bed pillows, and since a corduroy cover in the shape of a bolster could accommodate a bed pillow, as illustrated by defendant's exhibit A and plaintiff's illustrative exhibit 7, it too would be a pillowcase, in his opinion.

Mr. Handal further testified that his understanding of the meaning of the word "pillowcase" as embracing a cotton, rayon, or linen article used to cover a bed pillow, which is removable and washable, had not really changed over the course of the years since 1939, but modern living would also dictate that a pillowcase be decorative and, in this respect, he would consider that the meaning of the word had broadened. Nevertheless, he stated that an article like plaintiff's exhibit 1 is

"bought and sold as a pillow cover which is a new type of pillowcase." It does not have an open flap like a standard pillowcase, but it serves the purpose of a pillowcase, while at the same time it is also decorative.

Also testifying for plaintiff were Richard Snyder, a buyer of so-called domestic articles, that is to say, household items like bedding and towels, who had handled this line of merchandise for about 7 years, for Gilchrist's Department Store in Boston, and Arlan's Department Stores, a chain of discount shops; Larry Brockman, a salesman associated with a manufacturers' organization for about 37 years, who was in charge of linens and similar household accessories; William H. McCabe, a buyer for S.H. Kress & Co., who has dealt in domestic linens and rugs for about 27 years; and Harry R. Kay, a buyer of curtains, draperies, linens, and domestics for various department stores including, successively, Hearns, Lit Brothers, and the Charles Stores.

Generally speaking, the testimony of these witnesses accorded with that of the witness Handal. It was the consensus of these witnesses that articles like those here involved were designed to "liberate" a bed pillow from the bedroom and so decorate it that it could be used without embarrassment in the living room, and their experience with these articles indicated that they were in fact so used. The witnesses were unanimous in referring to plaintiff's exhibit 1 as a pillowcase, but, nevertheless, conceded that it differs from a traditional pillowcase in the respects pointed out by Mr. Handal, as well as in the fact that a pillowcase is usually loose fitting, whereas a pillow cover tends to fit snugly, and that a pillowcase is usually made of a smoother fabric. They also admitted that these articles are customarily bought and sold as pillow covers rather than pillowcases. It was, nevertheless, their shared opinion that the term "pillow cover" is more comprehensive than, and in fact includes, the term "pillowcase."

During the course of the testimony of the witness, Snyder, a foam pillow with a corduroy ticking was offered in evidence as plaintiff's exhibit 6, to illustrate a type of pillow which could "be used during the day without any covering and at night as a bed pillow or sleeping pillow by putting the traditional cover on it." Seemingly, the purpose of this exhibit was to illustrate the converse of a traditional pillow with a corduroy cover and to emphasize the more decorative aspects of the functions of a pillow.

Defendant's witness Marvin Kaufer is sales manager and general manager of the decorative pillow division of N. Summergrade & Sons of New York City, a firm which manufactures pillows, comforters, bedspreads, draperies, decorative pillows, and pillow covers. He testified that an item such as plaintiff's exhibit 1 is sold as a decorative pillow cover and used primarily as "a decorative item to add to the décor of a room." It is, however, usually taken off the

pillow at night and replaced by a "regular bed pillow cover" for sleeping.

Mr. Kaufer further stated that pillow tickings are not usually made of corduroy because the cost of a pile fabric is much higher than that of a cotton fabric and because the ribbing of a fabric such as corduroy is not too comfortable for sleeping. He admitted, on cross-examination, that plaintiff's exhibit 1 is sometimes referred to as a pillowcase, but was of opinion that it is generally known as a pillow cover, and gave the following explanation:

All the previous witnesses have had a much more difficult time in ascertaining the difference between a pillowcase and a pillow cover. In my general rule, it is at least my experience with selling to the various domestics in departments that a pillowcase is made of a cotton percale or a satin which is used, in other words, open ends which is slipped over the sleeping pillow. This is normally classified as a pillowcase. Corduroy such as what you see here, Exhibit A or Exhibit 1 is classified by us as a pillow cover and we sell it as a pillow cover. This does not mean that certain people can't come in and request this thing as a pillowcase.

Mr. Malcolm Shults, the remaining witness for the defendant, is the products manager for the Utica Mohawk sheet department of J. P. Stevens and Co., a manufacturer of textiles. The Utica Mohawk division is one of the largest manufacturers of sheets and pillowcases in the world. In the opinion of this witness, a pillowcase is made of cotton, is closed on three ends and open on the fourth end, which usually has a wide hem. It is for use on a bed to cover a pillow and must be capable of being easily removed for frequent washing. Although he does not handle articles like plaintiff's exhibit 1, he does not believe that they are of a class or kind which his trade would recognize as a pillowcase for the reason that "[w]e are principally dealing in linen, bed linens and this type of a cover would not be used."

Predicated upon the evidence adduced on its behalf, counsel for the plaintiff urges that the article at bar was designed as a pillowcase, intended to be used exclusively as a pillowcase, and, although not in existence in 1930, falls within the common and tariff meaning of the term "pillowcase" as known and understood in 1930. The contention is that, notwithstanding the more diversified uses which it serves in keeping with modern style trends, since plaintiff's exhibit 1 is a removable covering for a bed pillow, it meets the definitions of the term "pillowcase" which were current in 1930 and adopted by this court in the case of *W. J. Byrnes & Co. of L.A., Inc., and Fortune Trading Co., Inc.* v. *United States*, 47 Cust. Ct. 118, C.D. 2290.

Counsel for defendant seeks to preserve the distinction between a traditional pillowcase used to cover a bed pillow and a cover which adapts a bed pillow to living room use on couch or sofa, suggested in the *Byrnes* case, notwithstanding the articles here in issue are removable, washable cotton covers for bed pillows.

The merchandise involved in the *Byrnes* case consisted of cotton corduroy zippered covers for decorator or throw pillows, not larger than about 18 inches in width. It was classified, as was the merchandise at bar, within the provisions of paragraph 909, *supra*, for articles made or cut from cotton corduroy fabrics and claimed to be more specifically provided for in paragraph 911(b), as modified, *supra*, as pillowcases wholly or in chief value of cotton.

In concluding that the tariff provision for pillowcases was not intended by Congress "to include every removable covering for a pillow, but only such as usually encase bed pillows," this court cited with approval the following definitions, also adverted to in the case of *Freund Freund & Co.* v. *United States*, 72 Treas. Dec. 648, T.D. 49264.

*Pillow*, n. 1. A bag or case of cloth stuffed with some yielding material, as down, feathers, or hair, or something made of rubber inflated with air, used as a support when one is reclining or sleeping; especially such a rest for the head as used on a bed: generally covered with a removable case made of linen or cotton cloth.

*Pillowcase*, n. A covering, generally of linen or cotton cloth, drawn over a pillow, to be replaced when soiled. [New Standard Dictionary, 1930 edition.]

*Pillow*, n. 1. Anything used to support the head of a person when reposing; esp., a sack or case filled with feathers, down, hair, or other soft material.

*Pillowcase*, n. A removable covering for a pillow, usually of white linen or cotton cloth. [Webster's New International Dictionary, 1933.]

Seemingly, counsel for the plaintiff in the instant case rationalizes from the ultimate conclusion in the *Byrnes* case that, since the subject merchandise is a covering for a bed pillow, it is *ipso facto* embraced within the meaning of the term "pillowcase" notwithstanding the fact that it converts the bed or sleeping pillow into a lounge or napping pillow. We are of opinion, however, that this assumption overlooks both our reference in the cited case to articles which *usually* encase bed pillows and our discussion of the term "pillowcase" in the context in which it appears in the tariff act and pertinent trade agreement. We there observed:

While, in the generic sense, the term "pillowcase" as so defined may properly serve to describe every removable outer covering for a pillow, we seriously question whether Congress wrote this word into the tariff act with so broad a construction in view. It must be remembered in the first instance that the provision for pillowcases does not stand alone in paragraph 911(b), either as originally enacted or as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, *supra*. In a single clause, with but one rate of duty applicable, Congress has provided for both sheets and pillowcases, wholly or in chief value of cotton. This is so commonplace an expression, and so ordinary a coupling of these two items as naturally to suggest those articles which normally constitute bedding; the one to cover and protect a mattress, the other to cover and protect a bed pillow. That this is in fact, the sense in which Congress employed these two words seems to flow from the following comment in the Summary of Tariff Information, 1929, prepared for the use of the Committee on Ways and Means of the House of Representatives in connection with its

consideration of the bill which became the Tariff Act of 1930. It is there stated, at page 1578:

> * * * Bed sheets are ordinarily made of wide plain-woven cloth, and pillowcases of plain-woven cloth, some of it tubular, cut to appropriate lengths and hemmed. Sheets and pillowcases are usually made from bleached cloth but some are made from cloths piece-dyed in tints to harmonize with the color scheme of the bedchamber.

In the case of *Knauth, Nachod & Kuhne* v. *United States*, 31 Treas. Dec. 213, T.D. 36689, it was held that the provision for sheets in paragraph 264 of the Tariff Act of 1913 was not a general provision intended to cover all sheets composed of cotton, but rather a "denominative" term enacted to provide for a specific article, to wit, the article "used as bedding to separate the sleeper's body from other bedclothes."

It seems clear from the foregoing that what we said, and, indeed, intended to say, in the *Byrnes* case was that the article described by the provision for pillowcases in paragraph 911(b), *supra*, was the article which is commonly considered to be an item of bed linen—an article which encases a bed pillow, for sleeping and which, together with a sheet or sheets, constitutes protective covering for pillow and mattress and blanket.

We are not unmindful of the testimony in the instant case which tends to show that the subject merchandise possesses some of the characteristics of a pillowcase and, although generally referred to as a pillow cover, is also known in the trade handling "domestics" as pillowcases. However, there was no effort here to establish a commercial designation different from the common meaning, so that under settled principles of law, the latter is what here governs, *United States* v. *Tropical Craft Corp., Successors to Tropical Craft Import & Export Corp.*, 42 CCPA 223, C.A.D. 598, and, while the testimony of witnesses is admissible to aid the court in the determination of common meaning, such testimony is advisory only, and without binding effect, *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 CCPA 24, C.A.D. 209. In the last analysis, common meaning is a question of law to be decided by the court. *United States* v. *Florea & Co., Inc.*, 25 CCPA 292, T.D. 49396; *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388, and common meaning once declared persists until a change in the law is effected by the legislature, *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 CCPA 146, T.D. 48009.

As we interpret the provision for pillowcases which is here under consideration, in the light of our observations and conclusions in the *Byrnes* case, *supra*, it is our view that it encompasses only those conventional articles which typically encase traditional bed pillows and normally serve the function of covering such pillows during usual sleeping hours. A cover, such as plaintiff's exhibit 1, whose primary purpose is in reality to disguise a bed pillow and adapt it to a some-

what different use, does not comport with what we consider to have been the congressional intendment in the enactment of the tariff provision for pillowcases.

By reason of the foregoing, we are of opinion that the contention of the plaintiff in the instant case lacks merit. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.